# Wheeling.

## KEYSTONE BRIDGE CO. *v.* SUMMERS, *et al.*

Decided July 6, 1878.

1. The obstruction to a public highway, to justify the interposition of a court of equity by injunction, must be more than a mere public nuisance threatened, it must work a special injury to the plaintiff; and the injury threatened must not be trivial, nor such as might be fully compensated in an action at law.

2. If the right of the public to the use of the highway is clear, and a specific injury is threatened, of a serious nature and permanent character reaching to the very substance and value of the plaintiff's estate, by an obstruction of the highway, a court of equity ought to prevent such obstruction by injunction.

3. Under the road law chapter 194 of acts of 1872-3, in the establishing of county roads by a county court: 1. It is unnecessary to cause notice thereof to be given to any person having liens on the land to be taken, or to any claimants of such land, other than the tenant in possession of the land as visible owner. 2. If the damages, or just compensation, in such cases are assessed under a writ of *ad quod dammum*, the county is chargable with such compensation; but it is not to be paid, till after the road has been established, and the land actually appropriated. 3. The party entitled to such compensation, so ascertained, though he be not the tenant in possession as visible owner, who alone was notified of the proceedings, may compel the payment of such compensation in the same manner as any other charge against a county is enforced. 4. If the road has been established by the consent of the tenant in possession as visible owner, without a writ of *ad quod dammum*, the party entitled to the compensation, if he be some other than this tenant, may affirm the agreement between this tenant and the court, and enforce the payment of the

compensation, agreed on, to himself; or he may, if the agreement was made without his authority, require a writ of *ad quod damnum* to assess the compensation, to which he is entitled; but his so doing in no manner affects the right of the public to the use of the road already established, when such tenant alone was before the court. 5. The provisions of the road law do not violate the 9th section of our bill of rights declaring, that private property shall not be taken or damaged for public use without just compensation; nor the 10th section of our bill of rights declaring, that no person shall be deprived of life, liberty or property without due process of law.

4. Under the 21st section of the road law, ch. 194 of acts of 1872-3, a surveyor may change a road, with the consent of the owner of the land, in which such change is made, in the manner therein provided; but he has no authority to discontinue any portion of a road, without opening another in lieu of the portion discontinued, even though there be another public road already existing, which might be used instead of the portion of the road discontinued.

Appeal from, and *supersedeas* to, a decree of the circuit court of Kanawha county, rendered on the 1st day of June, 1877, in a cause in said court then pending, wherein the Keystone Bridge Company was plaintiff, and Lewis Summers and William McCraig were defendants, allowed on the petition of the said Summers.

Hon. Joseph Smith, judge of the seventh judicial circuit, rendered the decree appealed from.

GREEN, PRESIDENT, furnishes the following statement of the case:

In February, 1877, the Keystone Bridge Company filed a bill in the circuit court of Kanawha county against Lewis Summers and William McCraig, alleging that it, as a corporation, owned a toll bridge across Elk river near its mouth, the western approach to which was a legally established county road, connecting the bridge with the Charleston and Point Pleasant turnpike, and that this county road is under the charge of William McCraig, a regular appointed road surveyor; but that Lewis Summers, without authority, had caused obstruc-

tions to be placed in this county road, and threatened to further obstruct the same. That the said William Mc-Craig, the surveyor, refused to remove or prevent such obstructions, whereby the plaintiff and others sustained serious and irreparable loss.

The bill prayed, that Summers and all others be enjoined till the further order of the court from obstructing this county road, and for general relief.

The injunction asked was awarded February 27, 1877.

Summers filed an answer to the bill; and to this the plaintiff replied generally. The defendant moved to dissolve the injunction, which the court, by an order made June 1, 1877, refused to do; and from this order Summers has appealed to this Court. The facts of the case as shown by the record are as follows:

There is a suspension bridge across Elk river a short distance above the Keystone bridge; and the Charleston and Point-Pleasant turnpike leads to this suspension bridge. Connecting these two bridges is a road, dedicated to the public, along the western side of Elk river. This road runs through land formerly belonging to Major Carr, which had been purchased by J. B. Walker. Other streets were also opened on the Carr land. Behind the Carr land lay a farm, which formerly belonged to the defendant, Summers.

On February 10, 1871, Summers sold this farm to Walker, who conveyed it at the same time to William S. Laidley, trustee, to secure the unpaid purchase money, amounting to $36,414.00. A plat was made by Walker extending the streets on the Carr land through this land, bought of Summers. Among the streets, so drawn as extended, was one known as Kanawha street, which is the same as the county road named in the bill.

On September 1, 1873, Walker and wife sold and conveyed all this land, he had bought of Carr and Summers, as also certain land, he had bought of Holly Hunt, to the West Charleston Extension Company, excepting numerous lots, which had been previously sold by Walker.

He did not execute a deed for these lands, though he did execute and have recorded an agreement, whereby he admitted this sale to have been made, and that the legal title was to be retained by Walker, as trustee, for the convenience of making deeds to purchasers of lots, the purchase money to be paid over to the West Charleston Extension Company after the retention by Walker of the amount sufficient to pay off his vendor's lien, which was retained.

The following orders show, what proceedings were taken by the county court of Kanawha with reference to the county road, named in the bill.

The following order was made on the 2d day of November, 1875 :

"Upon the petition of E. S. Arnold and N. Fitzhugh, and forty-two others, in writing, and upon the report in writing of Henry Fry Aultz, W. W. Wheeler, and John W. M. Appleton, who were appointed by a former order of this court viewers of the proposed way from Elk river at the Keystone bridge along Kanawha street of West End, to its intersection with the Charleston and Point Pleasant turnpike near Holly Hunt's residence, and upon the written evidence, filed with said report, of the important facts, that the said road has been well made and turnpiked by private parties, at their own expense, and tendered to the county of Kanawha free of costs, and it is the shortest road to the court house, is perfectly straight and level, and sixty feet wide, and that the West End Extension Company, through whose land the same passes throughout, having consented in writing to the same, and to the establishment thereof as a public road, and upon the map and survey thereof, as filed with said report, showing accurately the said Kanawha street throughout, and the adjacent localities; and upon consideration whereof, and of all the evidence touching the same, it is ordered by the court, that the said proposed road be established as a public road, and the bounds of the said road precinct shall be, as set out and described

in the said petition and report and map; and that Elisha Williams be, and is hereby, appointed overseer of said road; and that all the hands, residing within the bounds of said road, do aid him in keeping the said road in repair."

And on the 15th day of January, 1876, the following order was made by said county court:

"The petition of W. T. Lucadoe and others, asking that the road established at the October term, 1875, known as the Keystone Bridge road, be vacated, annulled and set aside, and the said matters and things arising on said petition are continued until February term next. And it is ordered that a rule be issued directing the petitioners, at whose instance the said road was established, to appear at February term next, and show cause, if any they can, why the said order establishing the said Keystone Bridge road shall not be set aside, and that service of the same be had upon J. H. Brown, counsel for petitioners, which shall be deemed sufficient."

And on February 24, 1876, the following order was made:

"The petition of W. T. Lucadoe and others, asking that the order establishing the said road be set aside, coming up, and J. H. Brown appeared for the parties, who resisted the action asked for in said petition; and the matters arising thereon being argued and considered, the court, upon consideration, doth refuse to set aside the order establishing the said Keystone Bridge road. It is further ordered, that so much of the order referred to, appointing E. Williams as surveyor of the said Keystone Bridge road, is set aside; and that the hands in said precinct be required to work under the direction of the surveyor of Precinct No. 2; and that so much of the order aforesaid, as establishes a precinct out of Precinct No. 2, is also set aside, and held for naught."

The record does not show, who were the forty-two others, who united with Arnold and Fitzhugh in petitioning to open this county road; nor does it show,

who the others were, who united with Lucadoe in asking

to have the order annulled, by which this road was established.

Afterwards on February 17, 1877, the trustee, Laidley, pursuant to the deed of trust of February 10, 1871, sold said land, conveyed to him by Walker, to pay the purchase money due to Summers, excepting from the sale certain lots, which had been conveyed by Walker to other purchasers. The whole of this property so sold was purchased by Summers. He paid for so much of this land, as lay betweecn this county road, or Kanawha street, and the Kanawha river, $10,000.00; for so much of this land, as lay on the other side of this county road or street, $5,000.00; and for the road, which was sold separately, $5,000.00. These sales left a balance still due to Summers of $13,747.67. And on the day this sale was made the trustee, Laidley, made a deed for these lands to Summers.

And a few days thereafter W. McCraig, the road surveyor, served on Lewis Summers and Holly Hunt the following notice :

"*To Lewis Summers and Holly Hunt* :

"You are hereby notified, that I, as surveyor of roads for Precinct No. 2, in Charleston district, in Kanawha county, for roads lying between Elk river and Two Mile creek of Kanawha river, have changed the road running from the Keystone bridge through your farms respectively, and turned the same from its junction with Pennsylvania avenue up said avenue, until it strikes the county road running from the Suspension bridge to Two Mile bridge.

"Therefore the road from said Pennsylvania avenue through said farms has been vacated as a county road; and you are at liberty to close the same or not, as you may deem proper.

"W. McCRAIG.
"*February* 22, 1877."

1878
June Term.

Keystone Bridge
Company
v.
Summers et al.

After this notice was given, Lewis Summers fenced up this road, and declared his purpose to cultivate the land, over which it passed. And thereupon the Keystone. Bridge Company filed its bill of injunction.

The clerk certifies, that the original petition to open this county road, the report of the viewers and the consent to its being opened by the West Charleston Extension Company, which were all filed on November 2, 1875, and which are referred to in the above order establishing this county road, have all been mislaid, or taken from the office.

In the case of *Walker* v. *Summers et al.*, reported in 9 W. Va. 533, the right of Walker to dedicate to the public these streets through the lands bought of Summers, without his consent and to his prejudice, was considered; but this case is not in any way referred to in the proceedings in the case now before this Court.

The answer of Summers states, that "he has by virtue of a tax sale been again possessed of his said land, and has also purchased the same under a sale made by the trustee, Laidley." He also says, that after the granting of the order of injunction the fences, which he had built across this road, were pulled down secretly at night; and his farm thus exposed to cattle; and that, if required to keep open this road, he will have to build a fence on each side of this road for a mile or more. He insists, that this road was illegally opened; "that the whole matter was prepared and presented to the county court at one time, that is, the petition, the order appointing the viewers, the report and the order establishing the road; that, on the representation made, the court made this order establishing the road, which, he insists, is a nullity."

As reasons for so regarding it, in his answer or petition for an appeal he insists, that the order establishing this road violates the Constitution of the United States and of this State, by depriving him of his property without due process of law, and by taking private

property for public uses without just compensation, neither he, Holly Hunt, nor the trustee, Laidley, being before the county court, when this order was made. He insists, that not having been brought before the court, and having had no notice of these proceedings to condemn the land for a county road, he is not bound by the order establishing it; and if it had been so established, it was vacated by the notice of the surveyor, William McCraig. There is no evidence or proof in the record, other than the statement in the answer, that Summers had bought this land at a tax sale. The answer and bill are both sworn to.

The order or proceeding to dissolve the injunction, which is appealed from, is in these words:

"This cause came on this day to be heard on the defendant's motion to dissolve the injunction awarded to the complainant by Honorable Evermont Ward, judge of the ninth judicial circuit of West Virginia, on the 27th day of February, 1877; and the said motion was considered on the complainant's bill and the answer thereto, filed by the defendant, Summers, with exhibits referred to therein, and on general replication to said answer, and on the papers filed on a former day of this term, and on the certificate of Joel S. Quarrier, clerk of the county court of Kanawha county, dated May 23, 1877, and filed in the cause, and on arguments of counsel, whereupon the court is of opinion to, and doth accordingly, refuse to dissolve the said injunction."

*William A. Quarrier*, for appellant, cited the following authorities:

10 Wall. 316; 15 Gratt. 528; 7 Leigh 226; 27 Cal. 300; 30 Conn. 190; Art. 5 Amended Const. U. S.; Const. W. Va. Art. 3, §9; 30 Barb. 344; 9 W. Va. 703; 5 W. Va. 57; 9 W. Va. 215; 6 Wheat. 119; Freeman on Judgments §141; 1 Pick. 106; 17 Ohio 239; 2 Gratt. 250; 3 Rand. 511; 4 Rand. 600; 15 Gratt. 202; 11 How. 437; 2 Metc. 135; 9 Mass. 462; 15 Johns. 121; 9 W. Va. 533.

1878
June Term.

Keystone Bridge
Company
v.
Summers et al.

*J. H. & J. F. Brown* and *W. H. Hogeman*, for appellee, relied on the following authorities :

2 Rob. (old) Prac. 231, 233, and cases cited ; 4 W. Va. 11; *Id.* 499 ; 5 W. Va. 86 ; 9 Leigh 119 ; 9 Gratt. 323 ; 12 Gratt. 85 ; 13 Gratt. 152 ; 2 Gratt. 589 ; 10 Pet. 449 ; 2 Wall. 328 ; 4 Cranch 241 ; 17 Gratt. 386, 391 ; Acts 1872-3 p. 571, §31; Tyler on Bound. 104, 113, 125 ; 2 Metc. 151 ; 1 Allen 446 ; 34 Vt. 289 ; 34 Barb. 494, 515 ; 23 N. Y. 498 ; 37 Conn. 229 ; 8 Bush 670 ; 7 C. B. N. S. 328, 336, 339, (97 E. C. L. R. 327, 335, 338) ; Acts 1872-3 pp. 292, '572, §35 ; *Id.* §37 ; 9 Gratt. 26 ; 4 Call 374 ; Acts 1872-3 p. 455 ; *Id.* 315 ; *Id.* 331 ; 6 W. Va. 576 ; Acts 1872-3 p. 292 ; *Id.* 571, §30 ; *Id.* 575, §43 ; 15 Gratt. 545 ; 1 Conn. 103 ; 15 Gratt. 254 ; Potter's Dwarris on Statutes pp. 388, 389, 391 ; 20 Johns. 735, 744, 745 ; 6 Pet. 431 ; 9 Cranch 292 ; 2 Strange 1004 ; 3 Bing. 447 ; Acts 1871-3, p. 322, §25 ; Tyler on Bound. pp. 104, 113, 125 ; 2 Metc. 151 ; 23 N. Y. 498 ; 37 Conn. 229 ; 105 Mass. 328 ; 8 N. H. 96 ; 38 N. H. 213 ; 44 N. H. 462 ; 5 Jones L. (N. C.) 63 ; 1 Hill 17 ; 7 Metc. 110 ; 13 Pick. 323 ; 33 Mass. 698 ; 30 Vt. 242 ; 5 W. Va. 57 ; 9 W. Va. 212 ; *Id.* 703 ; 6 Wheat. 119 ; 10 Wall. 316.

GREEN, PRESIDENT, delivered the opinion of the Court :

The first enquiry is : Did the bill in this case present on its face sufficient facts to justify the awarding of the injunction ? A court of equity ought not to interfere by injunction to prevent a public nuisance, when the party asking its aid shows no private injury actually sustained or justly apprehended by him. *Beveridge* v. *Lacey*, 3 Rand. 63. The obstruction to a public highway, to justify the interposition of a court of equity, must be more than a mere public nuisance, it must work a special injury to the plaintiff: *Coming et al.* v. *Lowerre*, 6 Johns. Ch. 439 ; and such injury must not be trivial,

and such as may be fully compensated in an action at law. *Fort et ux., et al.* v. *Groves*, 29 Md. 188. But if the right of the public to the use of a highway is clear, and a special injury is threatened by an obstruction of the highway, and this special injury is serious, reaching the very substance and value of the plaintiff's estate, and is permanent in its character, a court of equity by an injunction ought to prevent such a nuisance. *Green* v. *Oakes*, 17 Ill. 249; *The Mohawk Bridge Co.* v. *The Utica and Schenectady Rail Road Co.*, 6 Paige 563; *Jerome* v. *Ross*, 7 Johns. Ch. 322; *Crenshaw* v. *State River Co.*, 6 Rand. 245.

In this case the public highway is the approach to the plaintiff's toll bridge from the eastern side; and its obstruction must necessarily injure most seriously the value of this bridge as a toll bridge. The plaintiff by this public nuisance sustains a peculiar injury, which cannot be compensated adequately by a common law suit. The obstruction, which he seeks to enjoin, is a perpetual closing of this public highway; which must operate a permanent injury to the plaintiff's toll bridge, rendering it comparatively valueless.

The case comes directly within the prevention, or, I might say, preservation powers, of a court of equity. The fact, that the defendant, Summers, had already obstructed the road before the granting of the injunction, was no reason, why it should not be granted, as he threatened to continue this obstruction permanently. In such a case a court of equity alone can furnish adequate redress.

Summers by his answer denies, that this road was a public highway. And if this be so, the injunction ought to be dissolved. The whole case rests on the question: Is this road a public highway? Has it ever been legally established as such; and if so, has it been since legally closed?

The county court of Kanawha had an unquestionable right, after taking certain steps, to make an order estab-

1878.
June Term.

Keystone Bridge
Company
v.
Summers *et al.*

lishing this road as a public highway.    Acts of 1872-3
ch. 114, §36 p. 292 and ch. 194, §42 p. 575.    The order
of this county court made November 2, 1875, expressly
establishes this road as a public highway.    Were all the
steps, which were necessary to give this county court
jurisdiction to establish this road, taken ; or is the order
a mere nullity, because preliminary steps essential to
give the court such jurisdiction were not taken ?

The appellants' counsel insist, that before a county
court has any jurisdiction to establish a road as a public
highway, the proprietors or tenants of the property,
which will have to be taken or injured, must be notified,
or they must voluntarily appear ; and that Lewis Sum-
mers and his trustee, W. S. Laidley, were the proprie-
tors and tenants of the property taken in this case, ac-
cording to true interpretation of the law ; and neither of
them having been summoned or appearing before this
county court, it had no authority to make the order es-
tablishing this road ; and that the order, made by it on
November 2, 1875, establishing this road as a public
highway, is therefore a mere nullity.

Laidley had neither the beneficial interest in the
land taken for this road, nor had he the possession thereof
he had only the naked legal title to the land, which he held
as trustee for others.    Summers did not have the legal
title to the land, nor did he have either the possession
thereof, or a right to the possession.    He had only a
lien on this land, to secure the portion of the purchase
money, which was then unpaid.    He had a right only to
have the land sold, or so much thereof as was necessary,
to pay his lien, if Walker did not pay it before the day of
sale.

Could the county court of Kanawha establish a county
road though this land, without the consent of parties
having this kind of an interest, and without first noti-
fying them ?    This depends upon the construction of
chapter 174 of the acts of 1872-3, which confers on county
courts the right to establish county roads, and prescribes

1878
June Term.

Keystone Bridge
Company
v.
Summers *et al.*

the mode of proceeding in such cases. A correct interpretation of this act with reference to this point, and others arising in this cause, will be aided by a review of the laws in force in reference to the condemnation of lands for public use, at the time this statute was enacted.

The Code of Virginia provides, that "a person having, upon lands owned by him on a water course, or proposing to build on such lands, a water-mill, or other machine, manufactory or engine, useful to the public, and desiring to erect a dam across or in such water course, or to cut or enlarge a canal through lands above or below, or to raise a dam, which may have been erected under an order of the court, may apply to the court of the county, wherein such mill, machinery, manufactory or engine stands, or is proposed to be built, for a writ *ad quod damnum.* Of such application ten days previous notice shall be given, in the manner prescribed, *to the tenant of the freehold,* his guardian or committee." See Code of Virginia of 1860, ch. 63, §§1 & 2. The court, on the return of this inquest, is authorized to grant the leave asked, on certains conditions; and then the 7th section of the act provides: "The applicant, to whom such leave may be granted, shall, upon paying to the several parties entitled thereto the compensation so ascertained, become seized in fee simple of the land circumscribed by the jury, and be authorized to proceed according to such leave." See Code of Virginia of 1860, p. 370.

A law similar to this had been long in force in Virginia, except that it did not comprehend as many purposes, for which such a condemnation could be had.

A law applicable to mills, passed in 1792, was in the matters above stated, the same as this. See Revised Code of 1803, vol. 1, ch. 105, p. 197. We may call it the mill law of Virginia. The law was re-enacted in the Code of West Virginia, but with important variations. The application was to be made to the circuit

1878
June Term.

Keystone Bridge
Company
v.
Summers et al.

court; the notice was to be given in the manner prescribed on all owners, claimants, and persons holding liens on the land, instead of the tenant of the freehold; the ascertainment of the just compensation was made by commissioners, instead of by a jury, and when ascertained the court was authorized to grant the leave upon certain conditions; when the law provided: "the applicant, to whom such leave may be granted, shall, upon paying to the several parties entitled thereto the compensation so ascertained, become seized in fee simple of the lands circumscribed by the commissioners, and be authorized to proceed according to such leave." See Code of West Virginia, ch. 44, §32.

The Virginia mill act has been construed by the Court of Appeals of that State. It originally required the notice to be given to the "proprietor of the land proposed to be taken." The person to be notified was, in the re-enactment of the law, designated as the "tenant of the freehold." The Virginia Court of Appeals has decided, that by both phrases the same person was meant, that is, "the tenant in possession as the visible owner of the land;" and that it was only necessary to serve notice on him, though he was not the real owner of the land to be taken.

President Pendleton, in delivering the opinion of the court in *Wood* v. *Boughan,* 1 Call, 332, intimates, that this was the true construction of these words in the mill law of Virginia, though it was not then so decided. This construction of these words received some countenance from the decisions in *Colman* v. *Moody,* 4 H. & M., 1; and *Anthony* v. *Lawhorne,* 1 Leigh 1; and in the case of *Pitzer* v. *Williams,* 2 Rob. R. 241; and *Supervisors of Culpepper* v. *Gorrell et al.,* it was expressly decided, that this was the true construction of these words in this law.

Besides this mill law, the Code of Virginia contained a general law, by which corporations were to condemn lands of private persons for uses, in which the public

had an interest. It provided, that " if the president and directors of a company incorporated for a work of internal improvement, the court of a county, or the council of a town, cannot agree on the terms of purchase with those entitled to lands, wanted for the purposes of a company, county or town, five disinterested freeholders shall be appointed by the court of the county, or corporation, in which the land, or a greater part thereof shall lie, any three of whom shall act, for the purpose of ascertaining a just compensation for such land. When it is intended to apply for such appointment, ten days previous notice thereof shall be given, in the manner prescribed, to the tenant of the freehold, his guardian or committee." See Code of 1860, ch. 56 §§6, 7.

After reports from these commissioners, if good cause is shown against the report, this law provided for the appointment of new commissioners; and then provides: "whether any such new appointment be made, or not, the company, court, or town, on paying into court the sum ascertained by the previous report, may, notwithstanding the pendency of the proceedings, enter into and construct work upon, or through, the land described in such previous report; and no injunction shall be awarded, unless it is manifest, they are transcending their authority, and it is necessary to prevent injury, that cannot be adequately compensated in damages." See Code of 1860, ch. 56 §13 p. 325.

If another report is made, and confirmed, awarding a larger sum, judgment therefor is to be given against the company, county or town, and till its payment they have thereafter no right to the possession of the land; but " from the time of the satisfaction of the judgment by the payment of the money to the persons entitled thereto, or into court, the title of the land shall be absolutely vested in the company, county or town in fee simple." See Code of Va. 1860, ch. 56, §15, p. 325. " To enable the court to dispose properly of the money, so paid into court, it might have enquiries by a commissioner to as-

certain, what persons are entitled thereto, and in what proportions; and might make an order of publication requiring all interested to appear before the commissioner, that their respective claims might be passed upon; and after such reference to the commissioner and publication the court could make such disposition of the money, so paid into court, as to it might seem right." See § 16, p. 325-6.

The act also, in lieu of this mode, provides for a general board of commissioners to be appointed, in a prescribed manner, to assess the compensation in all cases, instead of special commissioners in each case.

This we may call the general law of Virginia for condemning lands for public uses.

The West Virginia Legislature also passed a general law for the condemnation of lands for public uses, resembling this law in most respects, but differing from it in many material matters. It provided, that "in any case, in which real estate may be lawfully taken for public interests, application may be made to the circuit court to appoint commissioners, to ascertain a just compensation to the owners of the estate proposed to be taken." See Code of West Virginia, ch. 42, §2, p. 260. The application was required to be in writing, and to set forth not only the names of the owners, but also if any existed, the names of any persons having claims to the land, or judgment liens, or other liens, on the land, and the amount of such liens. The law then required: "Of such application ten days notice shall be given, in the manner prescribed by the act, to all owners, claimants and persons holding claims. See Code of W. Va. ch. 42, §6, p. 261. The Virginia general act provides only for notice to the ' tenants of the freehold.' "

The West Virginia act then provided, that if there were no liens or conflicting claims, the applicant and owner might agree on the compensation, on which the court could have an order transferring the title of the owner's interest in the land wanted to the applicant; otherwise

commissioners were to be appointed, and after a confir-
mation of their reports within twelve months, the amounts
ascertained " could be paid by the applicant to the per-
sons entitled thereto, or into court.  Upon such pay-
ment the title to the part of the land, so paid for, shall be
absolutely vested in fee simple, except in the case of a
turnpike, or other road, (not including however railroads,)
the right of way only shall be vested.  See §18.

The law then makes provision similar to the general
law of Virginia, before referred to, with reference to
subsequent reports, if the first report is not confirmed;
and for transferring, title in like manner, pending the
proceedings, to the applicant ; and for a disposition of
money paid into court after enquiry, as to who is entitled
thereto.  See sections from 18 to 23.

This act was repealed by the Legislature December
29, 1875, and another passed in its stead, the provisions
of which are generally copied from this chapter of the
Code of West Virginia, the law being modified only to
meet the requirements of our new Constitution, giving
a trial by jury of twelve freeholders to ascertain the
compensation, if required by either party, and also the
provision of the new Constitution, that property shall
not be taken by an internal improvement company, un-
til just compensation has been paid, or secured to be
paid, to the owners; and to give the county court juris-
diction instead of the circuit court.   See ch. 114 of acts
of 1875, p. 204.

This general law of Virginia, for the condemnation of
lands for public purposes, was construed by the Court of
Appeals of Virginia, to require notice to be given only to
the tenant in possession of the land to be taken, as the
visible owner, though he was not the real owner.  See
*Supervisors of Culpepper* v. *Gorrell et al.,* 20 Gratt. 512,
though the statute used the words " tenant of the free-
hold."

Besides this general law, and the mill law before re-
ferred to, the Code of Virginia contained a special

law for the establishment of county roads, which we may designate as the road law of Virginia.ᐟ It is found in the 52d chapter of the Code of 1860 beginning at §6 p. 298. It directs that upon application of any person to the county court to have a road or landing therein established, or altered, the court shall direct a commissioner, or viewers, to make a view of the proposed road, and report ; and if the opinion of the court be not against establishing, or altering, the road or landing, "it shall award process to summon the proprietor, or tenants, on which it will lie, if established, to show cause against the same" §8, p. 298.

If the court has enough before it to enable it to fix a just compensation to the proprietors and tenants, and they are willing to accept, what it deems just, it may determine the matter without a writ of *ad quod damnum.* See §9. But the writ shall be awarded, if desired by any proprietor or tenant, or if the court see cause for awarding the same. See §10. After the returning of the inquest, or verdict of the jury, the court shall determine, whether the road or landing shall be established, or altered, as proposed. See §13. And "when the road is established, or altered, the county shall be chargeable with the compensation to the proprietors or tenants." See §15.

This provision, it will be observed, is very different from the provision about the payment of the ascertained compensation, either in the mill law, or in the general law of Virginia, for the condemnation of land for public uses.

The mill law provides, that "the applicant, to whom leave to build a dam has been granted, shall, upon paying to the several parties entitled thereto the compensation so ascertained, become seized in fee simple of the land circumscribed by the jury, and be then authorized to proceed according to such leave." See Code of Virginia of 1860, ch. 63 §7. And the Court of Appeals of Virginia decided in *Anthony et al.* v. *Lawhorne,* 1 Leigh

1, that the court under this act had nothing to do with determining, who was the person entitled to this just compensation; but that the applicant had to determine this at his own risk, and until he paid the money to the person entitled to it, he acquired no rights by the order of the court granting him leave to build a dam.

On the contrary under the general law of Virginia for condemning lands for public purposes, the law expressly provided, that the court, after the condemnation of the land and the ascertainment of the just compensation, should, after enquiry by a commissioner of the court, an order of publication made requiring all persons to appear before him, that their respective claims might be passed upon, determine who is entitled to this just compensation, and make such disposition of money paid into court, as may seem to it right. See Code of Virginia of 1860, ch. 56, §16, p. 325-326.

But the road law now under consideration, as I understand it, simply provides, that the just compensation ascertained shall be a charge upon the county, to be paid to the party entitled to it, precisely as any other charge on the public treasury of the county is to be paid; and if not paid, to be enforced against the county, just as any other legal charge against the county is to be enforced.

The language of the 15th section of ch. 52 of Code of 1860 p. 299 is, " when the road or boundary is established, or altered, the county shall be chargeable with the compensation to the proprietors or tenants." Understand the words " to the proprietors or tenants " not to designate the party, entitled to charge the county with the compensation, but to qualify the words, " compensation " only, and to designate what compensation is meant, that is, the compensation, which had been assessed in the proceedings, in which the proprietor or tenant was the party. For this law like the mill law and the general law must necessarily be interpreted, to require no one to be notified, or made a defendant, in the pro-

ceeding, but the proprietor or tenant, that is, as construed by the Court of Appeals of Virginia, the "tenant in possession as the visible owner of the land."

The provision above cited in the mill law and general law of Virginia shows clearly, that the legislation, which it required for convenience, that no one but the "tenant in possession as visible owner" should in any case be notified, or formally be made a party defendant, yet it clearly contemplated, that some other person might be entitled to the compensation found in the proceeding, called, as it might well be in one sense, compensation to the tenant, he being the only party defendant. That this compensation might not belong to him, and was not in every case intended to be paid to him, is shown by the mill act requiring this compensation to be paid by the applicant to the party entitled at his own risk, though it had been assessed formally to the tenant, and this general act, though the compensation had been formally assessed to the tenant; or visible owner, yet expressly required the court afterwards to ascertain what persons are entitled to it, and to pay it to them, and not to the tenant.

It seems to me, therefore, that the 15th section of ch. 52 of Code of 1860, p. 299, must be interpreted, as making the county chargeable with this ascertained compensation, to be paid to the party entitled, and not necessarily to the tenant in possession as visible owner. But it may be said, that section 9 of this act, p. 298, provides, that "upon the return of the process executed on these tenants, if the court has enough before it to enable it to fix upon a just compensation to the proprietors, or tenants, and they are willing to accept what is deemed just, they may determine the matter without a writ of *ad quod damnum;*" and that it is a necessary implication from this language, that this just compensation must be paid to such tenant, or visible owner.

But this, it seems to me, has already been answered, and is further refuted by the very next section, §10, which provides: "but the writ shall be awarded, if de-

sired by the proprietor, or tenant, or if the court see cause
for awarding the same." If the tenant is willing to accept,
what the court deems a just compensation, how could the
court " see cause for awarding a writ of *ad quod damnum?*"
unless this cause was a knowledge or belief that some other
person besides the tenant, or visible owner, had an interest
in the property, and would be entitled to the whole, or a
part, of the compensation? If the court supposed this, they
would see cause for awarding the writ, though the tenant
was willing to accept what the court deemed just.

And if this was brought to the knowledge of the court,
it ought to award the writ. Its failure to do so would
not render its order establishing the road illegal; but if
the party really entitled to the compensation agreed on
was not the tenant, it might necessitate the court at a
future time to award the writ, as the parties entitled to
receive the whole, or any part, of the compensation
would have a right, at any future time after the establish-
ment of the road, to demand of the court, on proving
himself so entitled, a writ of *ad quod damnum* to ascertain
his compensation, unless he had authorized the tenant to
agree with the court on the compensation. The tenant
in possession as visible owner, is treated by the law, in
all proceedings on the part of the public to acquire title
to, or in, the property, as the proper party, or as represent-
ing the proper party; but he is not regarded as the proper
party necessarily to receive the compensation, and there-
fore not the proper party necessarily to fix, or agree
upon, the amount of the compensation, except so far as
such agreement may operate to confer title on the public
to, or in, the property.

But so far as the payment of this just compensation is
concerned, or the amount of it is to be fixed, this agree-
ment is not necessarily obligatory on the party really en-
titled to the compensation. He may adopt it, and charge
the county with the amount agreed upon, or he may, if
he has not either expressly or impliedly authorized its
making, repudiate it, and demand afterwards a writ of

*ad quod damnum.* If the tenant, or visible owner, agrees to give to the public the right of way without compensation, the party, really entitled to compensation, would for like reason have a right, after the establishment of the road, to demand his writ of *ad quod damnum.*

This being then the law of Virginia, when this State came into existence, our Legislature adopted a law for the establishment of county roads essentially different from this road law of Virginia. See acts of 1863, ch. 120, p. 179, and Code of West Virginia, ch. 43, §35, *et seq.* p. 274.

By the provisions of our Code a person, desiring the establishment, or alteration of a county road petitioned the board of supervisors therefor, who appointed viewers to view the ground, and make report; and unless on this report they abandon the work, they appointed a day for the hearing of parties interested, and gave notice to the proprietors, or tenants, of the property to be taken, or injured, to show cause against the same. The 37th section of ch. 43, p. 275, thus provides that " at any time, if the supervisors have enough before them to ascertain what would be a just compensation to the proprietors and tenants, and such proprietors and tenants are willing to accept, what the board deems just, said supervisors, upon such acceptance being reduced to writing and signed by the proprietors and tenants, may determine to undertake the work."

Thus far the law is almost identical with the road law of Virginia, above considered; but while the road law of Virginia provides, that if desired by the proprietor, or tenant, or the court saw cause for the same, the county court was directed to issue a writ of *ad quod damnum,* the Code of West Virginia provides, not for the issuing of a writ of *ad quod damnum* in any case by the board of supervisors, but says: "If they decide in favor of the same, and the compensation to be paid to any proprietor, or tenant, be not fixed by agreement, they shall order proceedings to be issued in their cor-

porate name, before the circuit court of the county, pur-
suant to the 42d chapter, to ascertain what will be a
just compensation to such proprietor, or tenant, in the
premises; and the board shall lay a sufficient levy for
the purpose; and when such compensation shall be so
ascertained, it shall be at the option of the supervisors
to pay the same, according to the eighteenth section of
said chapter, or to abandon the proposed undertaking."
See §38 ch. 43, p. 275.

The 18th section of ch. 42, which was to be
followed in the payment of the compensation, provides,
that "at any time within twelve months after the report
has been confirmed, and ordered to be recorded, the sum
ascertained, with legal interest from the date of the re-
port till payment, may be paid by applicant to the persons
*entitled thereto,* or into the court. Upon such payment,
the title to that part of the land, so paid for, shall be
absolutely vested in fee simple, except that in case of a
turnpike, or other road, (not including however a rail
road) the right of way only shall be so vested. See p.
264.

This chapter 42 is the general law of West Vir-
ginia for the condemnation of lands for public uses;
and under this law the board of supervisors were direct-
ed to proceed to ascertain the just compensation. When
the board of supervisors so proceeded, they were re-
quired, as we have seen, to state in their application to the
circuit court, not only the owners of each parcel of land,
and the nature of their respective interest, but also all
liens on such land by judgments, deeds of trust or other-
wise, and also all conflicting claims to the land to be
condemned. And of such application they were re-
quired to give ten days notice to all the owners of the
lands, and to all such claimants, and persons holding
liens." See ch. 42 §5 and 6, p. 260, 261.

And the 9th section, p. 262 provides: "the applicant,
(the board of supervisors when a county road was to be
opened) if it has stated in its application the sum of

money it was ready to pay to any owner, and such owner not being under disability consents to accept the same, and there be no lien on, or conflicting claims thereto, the court may order, that on such payment being made, the interest of the owner shall be transferred." Otherwise commissioners were to be appointed to ascertain the just compensation.

It is obvious under this road law, as contained in our Code, though the statute did provide in the words of the Virginia road law, that the board without any ascertainment of the compensation might undertake the work, if the tenants and proprietors were willing to accept, what the board of supervisors deemed just; and though this is spoken of as an agreement fixing the compensation to be paid to any proprietor or tenant, see p. 275, yet the law expressly provided, that the compensation was to be paid to the parties entitled, after an investigation by the court, and when before the circuit court, the proprietor or tenant was not permitted to waive an ascertainment of the amount of the compensation, if there were other claimants of the land, or if there were liens on the land, all of whom had to be made parties. See Code of West Virginia, p. 264, 265.

It is clear therefore, that the agreement of the tenant, or visible owner, with the board of supervisors of the amount of compensation, or the waving, by such tenant of any compensation, though it would have authorized the board to establish the road, yet it could not have been binding on any person, other than the tenant, or visible owner, so far as it undertook to determine the amount of the compensation, or so far as it undertook to waive all compensation.

The board of supervisors having been abolished, it <span>Syllabus 3.</span> became necessary, that in the establishment of county roads another road law should be enacted in lieu of this road law of our Code. This was done by the acts of 1872-3, ch. 194, commonly known as our road law. Its provisions were substantially the same as the road law

in the Code of Virginia of 1860, ch. 52, before construed. It is generally a literal copy of the Virginia road law; and the slight change in the wording of a portion of it, and some additional provisions in our law, in no manner affect the meaning of the act in reference to the subject which we have discussed.

1878
June Term.

Keystone Bridge
Company
v.
Summers et al

It provides only for the resummoning of the proprietors, or tenants, of the lands, on which the road will be, if established. Acts of 1872-3 ch. 194 §36 p. 573. It provides, as did the Virginia road law, that if the proprietors and tenants are willing to accept, what the county court deems just, the court may thereupon determine to undertake the work ; and if the compensation to be paid to any proprietor, or tenant, be not paid by agreement, the court shall award writ of *ad quod damnum*. See. §§37, 38, pp. 573, 574.

The language here is copied from the road act in the Code of West Virginia, for which our present road law is a substitute, except that in the circumstances, under which our law now requires the county court to issue a writ of *ad quod damnum*, the Code of West Virginia requires the board of supervisors to institute proceedings in their corporate name before the circuit court to ascertain the just compensation.

If we were only to look at the 37th and 38th sections of ch. 194 of acts of 1872-3, the natural inference to be drawn would be, that no one but the tenant in possession as visible owner was to be paid any compensation ; but the language, from which we would draw this inference, is copied from the Code of West Virginia ch. 43 §§37, 38, p. 275; and from this law of the Code, it is obvious, that inference could not be drawn, as by subsequent provisions for ascertaining the just compensation, as we have seen, that law expressly provided for the summoning of not only the proprietors of the land, but all claimants thereto, and all persons having liens on the land, and for an ascertainment, after the condemnation of the land, of the persons entitled to the compensation

special provision was made.    See Code of West Virginia ch. 42 §5, 6, 23, pp. 261, 265.

Our road law of 1872-3 also provides, (see act of 1872-3 §42, ch. 194, p. 575) : " that when the road, or landing, is established, or altered, the county shall be chargeable with the compensation to the proprietor or tenant." This language is copied from the road law contained in the Code of Virginia of 1860 ; and its true meaning, in that Code was, as before stated, that the county should be chargeable to the persons entitled to the compensation as ascertained in the proceedings, to which the tenant, or visible owner, was the party.    The same construction must be given to the words of our road law of 1872- 3, not only for the reasons before stated, but for the reason, that this act was a substitute for the road act, ch. 43 of Code of West Virginia, and in it the words " compensation to the tenant " are frequently used in this sense, and not as meaning compensation, which must necessarily be paid to him, as we have shown.

Our conclusion therefore is, that under our road law, ch. 194 of acts of 1872-3, the only persons required to be summoned are the tenants in possession of the lands, to be taken, as visible owners ; and then an order of the court can legally be made, if such tenants have been summoned, or voluntarily appear before the court, though neither the real owner, nor any other claimant or lienor, is before the court, that if the damages, or just compensation have been ascertained, when such tenants were before the court, by a writ of *ad quod damnum*, and the road established by the court, the county becomes chargeable with this just compensation so ascertained, which may be enforced, as any other liability against the county is enforced; that if the tenant in possession as visible owner has agreed with the county court on what is a just compensation, without a writ of *ad quod damnum* had, such tenant is not the party entitled in whole, or part, to the compensation, that any party so entitled may, if he chooses, adopt and confirm this agreement and enforce

payment of the compenstion agreed on, which is a charge
against the county, or he may repudiate such agreement,
and ask for a writ of *ad quod damnum,* but such repudiation
in no manner affects the right of the public to the use of the
road, which has been before established as a public high-
way; and if the tenant of the land as visible owner has ap-
peared, and given his consent to the establishment of the
road as a public highway without compensation, the court
may thereupon legally establish the road without any writ
of *ad quod damnum,* but the party entitled to the whole, or
any part, of the compensation may either assent to what
has been done, or he may ask for a writ of *ad quod dam-
num,* but his action in no manner affects the rights
of the public to the use of such road as a public high-
way.

Does this road act of 1872-3, when thus construed,
violate the Constitution? Can the party really entitled
to the compensation be thereby deprived of his property
without just compensation in violation of the 9th section
of our bill of rights? See Article 3, §9 of Constitution,
acts of 1872-3, p. 6.

It is unquestionably true, that he may be, and indeed
must be, in all cases deprived of his property taken for
a county road, before he receives just compensation, as
the law simply provides, that after the road has been es-
tablished, the county shall be chargeable with the com-
pensation. But it is well settled, that where property is
taken by a State directly, or by a town or county under
State authority by State authority, it is not essential, in
order not to violate this provision of the bill of rights,
that the law should provide for payment of the compen-
sation, before the property is taken and actually appro-
priated. See *Collison* v. *Hendricks,* 15 Gratt. 244; *Red-
ford et al.* v. *Knight,* 11 N. Y. 308.

The very wording of our bill of rights shows, that its
framers so understood its effect. Its language is "private
property shall not be taken, or damaged, for public use
*without* just compensation; nor shall the same be taken

1878
June Term.

Keystone Bridge
Company
v.
Summers et al.

by any company incorporated for the purposes of internal improvement, *until* just compensation shall have been paid or secured to be paid to the owner." If the county is chargeable with just compensation for property taken by it for public uses, there is no necessity, that the statute authorizing the taking of the property should provide for the payment in advance of the just compensation ; it is sufficient, that it provides for its payment afterwards. And this our road law does, when it makes the county chargeable therewith.

Does this act deprive any person of his property without due process of law, in violation of our bill of rights ? See Article 3, §10 of Constitution, acts 1872-3, p. 7.

There is much difficulty in defining the true meaning and operation of this provision of our bill of rights; and I shall not attempt this task. It does not require, that a person's right of property should in no case be affected by a judicial proceeding, unless he has been first personally served with process. The familiar cases of attachment proceedings, and the sale of lands by the statute for the non-payment of taxes are instances, where a person's property is disposed of in proceedings, in which he is given no personal notice. See *Matter of Empire City Bank,* 18 N. Y. 215.

Without undertaking to decide in what cases personal service of notice may be dispensed with, we can safely lay down this rule, that it may be dispensed with in all such summary proceedings, as did not require it at common law, and in all such cases as it was authorized to be dispensed with, or some substituted notice adopted by statute laws in force prior to the adoption of our bill of rights. All such summary proceedings must be regarded as understood under " due process of law." See *Rockwell* v. *Waring,* 35 N. Y. 315.

This provision of our bill of rights was adopted after the formation of this State, it not being in the Constitution of Virginia prior thereto. The condemnation of

land for public uses, after notifying only the tenant in possession, as visible owner, was a proceeding authorized by statute law long prior to the adoption of our bill of rights. It has been an established and recognized mode of proceeding for more than a century. It cannot therefore be regarded as depriving a party of property without due process of law. In adopting this provision of our Constitution, we cannot be regarded as prohibiting proceedings, long recognized by the Virginia courts as proceedings under " due process of law."

While the Court of Appeals of Virginia has never been called upon to pronounce on the constitutionality of their road law, they have considered and upheld the constitutionality of both their mill law and their general law for the condemnation of private property for public uses. See *Pitzer* v. *Williams,* 2 Rob. 241 ; *The Supervisors of Culpepper* v. *Gorrell,* 20 Gratt. 515. And these acts have in them all the provisions supposed to be objectionable in our road act.

I conclude therefore that it is not unconstitutional.

The next inquiry is: Were there such irregularities in the proceedings in the county court of Kanawha as to render its order of November 2, 1875, establishing this as a county road a mere nullity?

It is well established as a general rule, that if a court, which has jurisdiction of the subject matter, as the county court of Kanawha had, and also of the person, as that court had by the voluntary appearance of the tenant of the land before it, exercises its jurisdiction and pronounces in judgment, such a judgment cannot be treated as a nullity, or disregarded collaterally in any other suit because of irregularities in the proceedings. Such irregularities can as a general rule be only corrected in the suit by appeal, or otherwise. *Ex parte Kellog,* 6 Vt. 509 ; *Egerton* v. *Hart,* 8 Vt. 208 ; *Harvey* v. *Tyler,* 2 Wall. 328 ; *Voorhees* v. *Bank of the United States,* 10 Pet. 449.

When a court exercises in summary proceedings an

1878
June Term.

Keystone Bridge
Company
v.
Summers et al.

extraordinary power under a special statute prescribing its course, it has been held, that those facts, which give jurisdiction to the court, ought to appear, in order to show that its proceedings are *coram judice*. See *Thatcher* v. *Powell*, 6 Wheat. 119. In *Seibert* v. *Linton*, 5 W. Va. 57, this court held, that an order of the board of supervisors establishing a county road was a nullity, when the board, without the tenant of the land agreeing to accept the compensation fixed by the viewers, ordered the establishment of the road, and subsequently ordered the payment to the tenant of the amount of compensation fixed by the viewers.

The law then in force, if the tenant did not agree to accept what the board of supervisors deemed a just compensation, did not authorize the board to establish a county road, till they had in their corporate capacity instituted proceedings in the circuit court, to ascertain the just compensation, and the circuit court, after its ascertainment then had, certified it to the board of supervisors. This was an irregularity, which affected the jurisdiction of the court, its right to establish the road.

There are also cases in New York, where in proceedings to condemn land the court has held, that certain irregularities, which affected the jurisdiction of the court, have been held to render its decisions nullities. It is unnecessary to review these New York decisions, as they are in conflict with one another. See *Fitch* v. *Com'r of Kirkland*, 22 Wend. 132; *Tucker* v. *Rankin*, 15 Barb. 471; *Stewart* v. *Wallis*, 30 Barb. 344.

But when irregularities in proceedings to condemn lands have occurred, the Virginia Court of Appeals applied the same rules with reference to the waiving of irregularities, not affecting the jurisdiction of the court, which occurred in the case, as they apply in all other causes. *Bernard* v. *Brewer*, 2 Wash. 77.

We need not determine accurately the rule with reference to the effect of irregularities in cases of this description, for there were certainly in the establishment of this

road no irregularities affecting the jurisdiction of the court. In fact there were no irregularities, which would have vitiated the proceedings in an appeal in the cause, much less in a collateral proceeding.

The order of the county court of November 2, 1875, shows on its face, that every requirement of the road law was complied with, when this road was established. It is true, that the order shows, that the petition for the road was filed and a report immediately made by the viewers appointed by the court, and that, without formally summoning the proprietor of the land, the court proceeded to establish the road; but the order further shows, that the land was all owned by a single proprietor, who appeared without being summoned, and in writing consented to the establishment of this road as a public highway without any compensation, and that thereupon, evidence being produced, which satisfied the court of the propriety of so doing, the court at once ordered the establishment of the road, and appointed an overseer thereof.

In all this there was no irregularity. They could have acted still more summarily, had they thought proper so to act, without affecting the validity of their action. With the consent of the proprietor they could have established the road legally without appointing any viewers or having any report. See *Clarke* v. *Mayo*, 4 Call 374.

The fact, that there is in this order a misnomer of the tenant of the land, it being "The West End Extension Company" instead of " The West Charleston Extension Company," does not make the order irregular, as the clerk certifies, that the written consent of "The West Charleston Extension Company," referred to in the order of the court, was then filed with the papers of the proceedings, though it has been since lost; and the answer of Lewis Summers, filed in this cause, admits, that Walker was before the county court, and gave his consent to the establishment of this road; and the record shows,

that he was authorized to give such a consent for The West Charleston Extension Company.

Certain questions have been argued before us, which it is unnecessary for us to determine. The appellants insist, that the order of the county was a nullity, because the absolutely necessary parties to it were not before the court. We however think otherwise. They insist, that if this were so, they can assail the validity of the order in this collateral proceeding; and they refer to *Cooper* v. *Reynolds*, 10 Wall. 316; *Mosely* v. *Cocke*, 7 Leigh 226; Freeman on Judgments §141; *Shrewsberry* v. *Roylston*, 1 Pick. 106; *Irvin* v. *Smith*, 17 Ohio 239; *Webster* v. *Reid*, 11 How. 437; *Downes* v. *Fuller*, 2 Metc. 135; *Bissell* v. *Briggs*, 9 Mass. 462; *Borden* v. *Fitch*, 15 Johns. 121. On the other hand the counsel for the appellees insist, that there are many cases, where judgments bind those not parties : as proceedings *in rem*, appointments of personal representatives, probate of wills, proceedings by commissioners of school lands, and especially judgments establishing highways; and that whether the judgment of the county court be right, or wrong, it must stand, till set aside by the court, which rendered it, or till it is reversed; and they refer to *Fisher* v. *Bassett*, 9 Leigh 119; *Cox et al.* v. *Thomas's adm'r*, 9 Gratt. 223; *Hutchison, sheriff, adm'r* v. *Pridely*, 12 Gratt. 85; *Baylor* v. *Dejarnette*, 13 Gratt. 152; *Ex parte Ball & Satterwhite*, 2 Gratt. 589; *Rose* v. *Hensley*, 4 Cranch 241. They also refer to acts of 1872-3 ch. 194 §31 which declares that any road, worked as a public road under the directions of a surveyor of roads, must in all courts and places be deemed a public road.

As in our judgment all the necessary parties were before the county court, when the order establishing this road was made, and it was legally established, it is of course unnecessary to determine, whether in this case this Court would, or would not, regard it as a public road, had these important facts not been proven.

The question as to whether Lewis Summers, claiming as lienor for the purchase money of the land, has a right to just compensation, when a portion of this land was taken for a county road, remains to be decided. The counsel for the appellant insist, that he has, and that this Court so decided in effect in the case of *Walker* v. *Summers et al.*, 9 W. Va. 533.

In this case it appeared, that Walker had laid off on a map a large number of streets and alleys on the land purchased of Summers. These streets were almost entirely unopened, when Laidley, the trustee, advertised this land for sale to pay the unpaid purchase money due Summers, defendant. Walker, the plaintiff, insisted in that suit, that the trustee in selling the land should be required to sell the same by lots laid down on said map, paying respect to the streets and alleys on this map; and that he should not be permitted to sell this land in gross, or by the acre, paying no respect to the streets and alleys laid out on the map. The court below permitted the trustee to sell the land by the acre, or in gross, without respect to these streets and alleys on the map; and this decree of the court below was approved by this Court. The county of Kanawha was not a party to that suit; and the question, which has been discussed in this case, was not considered by the court in that case.

The statute law of West Virginia, by requiring all lienors to be summoned, seems to assume, that they may be entitled to a portion of the compensation for lands, taken for public uses, in other cases than the establishment of a county road; but there is no such assumption in the Code of Virginia, as lienors are never summoned by the Virginia law in any case. But the opinion of either Legislature on the question whether a lienor has a right to any compensation, when the land is taken for a county road, can have no weight in the decision of the question. It is a judicial question to be decided by the courts. The Legislature could not under the Constitution direct, that the compensation for the

1878
June Term.

Keystone Bridge
Company
v.
Summers et al.

the land taken should be paid to a lienor, who did not have a right to such compensation, nor could it direct, that it should be paid to some other person, if the lienor had a right to such compensation. The question, so far as I know, has not only not been decided, but it has never been brought before the courts. I express no opinion on the subject, as the question is not raised by the record in this case.

The only other question raised by the record is: Was this road ever legally closed?

The county court of Kanawha, which was authorized by the law to close, or discontinue, this road, refused on an application to discontinue this road. Its discontinuance however was ordered by W. McCraig, the surveyor.

Syllabus 4.

The 21st section of our road law, ch. 194, acts of 1872-3, p. 567, authorized the surveyor to change the county road without the consent of the owner, provided such change does not increase the length, or grade, or require more work to keep the road in repair, or place the same on worse ground than it was before, or render the road worse in any respect than it was before such change. But under this section the surveyor has no right to discontinue a road, or any portion of a road, entirely, without opening another in lieu of the road discontinued, merely because in his judgment another public highway established will answer for public uses in lieu of the discontinued portion of the road. And this is what the surveyor has attempted to do in this case.

Pennsylvania avenue, which the surveyor directs shall be used as a public road in lieu of the portion of this road, which he discontinued, was a public road running at right angles to the discontinued road, and terminating at a point probably a mile distant from the termination of the road, he attempted to discontinue. His discontinuance of this road was unauthorized by law, and inoperative therefore. My conclusion therefore is, that this road was legally established as a public road, and has never been legally discontinued; that the

threatened obstruction of it by Lewis Summers was properly enjoined by the circuit court of Kanawha, at the instance of the Keystone Bridge Company, as the right of the public to the use of this highway was clear, and the threatened obstruction operated a special injury to the Keystone Bridge Company, permanent in its character and serious in its nature, reaching to the very substance and value of its toll bridge.

The circuit court of Kanawha therefore did not err in its decree of June 1, 1877, refusing to dissolve this injunction; and its action must be approved and affirmed; and the appellee, The Keystone Bridge Company, must recover of the appellant, Lewis Summers, its costs expended in this court, and $30.00 damages; and the cause must be remanded to the circuit court of Kanawha to be further proceeded with, according to the principles laid down in this opinion, and further according to the principles governing courts of equity.

THE OTHER JUDGES CONCURRED.

JUDGMENT AFFIRMED.